■ PETER SZANTO
11 Shore Pine
Newport Beach CA 92657
949-887-2369

# United States District Court

### in and for the District of Oregon

1000 SW Third Ave, Portland ORE 97204

| | |
|---|---|
| Peter <u>SZANTO</u> <br><br> **<u>Involuntary Debtor, Petitioner</u>** <br><br> **<u>vs.</u>** <br><br> Chapter 7 Trustee <br><br> *++ **ORAL HEARING REQUESTED** ++* | **<u>## 3:21-cv-163</u> and <u>3:21-cv-417</u>** SI <br><br> **<u>From US Bankruptcy Court</u>** <br> **<u>District of Oregon</u>** <br> **<u>Core Case - 16-bk-33185</u>** <br><br> **Appellant's** <br> **<u>Opening Brief</u>** |

May it please this Honorable Court.

This appeal relates to Appellees' improper, fraudulent and untrue presentation of misleading information and materials to the Bankruptcy court.

Appellees' allegations, commencing in 2018 focused on the knowingly false and phony representation that Appellant, Peter Szanto, squirreled and stashed money in Singapore to avoid and evade the confiscation and expropriation of all his property by the Bankruptcy court and Appellees herein.

This Appeal attacks the resultant Bankruptcy court decisions regarding the findings which held Peter Szanto in contempt and commanded his arrest.

Demonstrated here is the allure of stealing $8.5 million from Appellant and also robbing $2.5 million from Susan Szanto were excellent inducements to compromise and **flush** all moral and ethical considerations required to practice law in Oregon.

**INDEX**

1. NO WAIVER / FORFEITURE of 28 USC 157(c) !! . . . 2

2. Jurisdiction . . . 3

3. Harmful Error Basis for Reversal . . . 4

4. FACTS . . . 5

    *a.* *How Susan Szanto's Singapore HSBC Bank Account Became
the Bankruptcy Trustees' Abusive Obsession* . . . 7

        1. Further Seizures . . . 8

        2. Trustees and Their Counsel Become Obsessed
With Non-Existent Money in Singapore . . . 9

        3. Trustee's Efforts at Intimidation
By Seeking Contempt ORDER . . . 10

        A. Trustee's Efforts to Abscond With Assets . . . 11

        4. Further Trustee's Efforts at Intimidation . . . 12

        5. Trustees Commence Litigation
Against Appellant in Singapore . . . 13

//////

//////////

6. Trustees Become Sad that they Are Unable to Abuse Singapore's Law in the Manner Judge McKittrick Allows them to Abuse USA Law

–

So They Pull "An Oldie But Goodie" Out of Their Bag of Trickery and Replead Contempt Knowing Full Well That Judge McKittrick Will GRANT Any Motion to Harm Peter Szanto Regardless of Facts, Truth, Law, Propriety, Morality or Any Other Aspect of Reality!! . . .13

    **A.**  Reality Must Be Allowed to Participate in this Bankruptcy . . . 14

    **B.**  Very Distinct Response to the Query of Appellees' Two Year Hiatus of Reliance on Contempt is that Appellees Sought to Pile on Obscene and Unconscionable Fees So As to Facilitate Their Abuse of their Trustee's Office by Obtaining Excessive Fees for Unnecessary Work and Non-Existent Controversies . . . 15

7. The Bankruptcy Court "Hand-in-Hand" With the Trustees Facilitates the Confiscation of Appellant's Money and Property By Failing to Allow Appellant the Fundamental Right to Defend Himself . . . 16

5. MEMORANDUM . . . 18

    *a.  Introduction . . . 18*

    ***b.  Finding Singapore's Law . . . 18***

c. Those Opposing Appellant are Privileged to do Whatever
they Please Irrespective of Truth, Justice, Law or Reality . .18

d. Putative Cause of Action in Singapore's Supreme Court
[APPENDIX 31-32] is Barred by the Laws of Singapore . . 22

e. The Tragedy in the Trial Court . . . 25

6. Declaration / Verification . . . 25

7. Conclusion … 26

WORD COUNT … 27

PROOF OF SERVICE . . . 28

<u>        CITATIONS</u>

**US CODE**

      28 USC § 157 . . . 2

      28 USC § 158 . . . 3

**SINGAPORE LAW**

      Singapore Supreme Court's Rules of Court, Order #1, Rule 4 . . . 22

      Singapore Supreme Court's Rule of Court Order 92 Rule 4 . . . 22

      *Singapore's Reciprocal Enforcement of Foreign Judgments Act* . . . 23

**CALIFORNIA LAW**

      California Code of Civil Procedure § 704.115 .. . . 7

***<u>Citations</u>***

*Allis Chalmers Credit Corp., et al. v. Tri-State Equipment, Inc.* (1986) 792 F.2d 967 . . .4

*Blackmer v. United States*, (1932) 284 U.S. 421 . . . 21

*Mullan v. Quickie Aircraft Corporation* (1986) 797 F.2d 845 . . . 4

*Vibra-Tech Engineers v. United States* (1986) 787 F.2d 1416. . . 4

# 1. <u>NO WAIVER / FORFEITURE of 28 USC 157(c) !!</u>

After 7 years of litigating in Oregon's Bankruptcy court, Appellant understands that court's foundational principal is waiver and forfeiture: constant, incessant and never ending involuntary abandonment, penalties of enforced loss which easily trump all legal principles of reliance on evidence, facts, reality, fairness. Forfeiture and waiver likewise brand as just plain silly the foundational principles of American law and jurisprudence of adjudication on the bases of truth and the merits of any dispute.

Appellant **does not agree, nor consent-nor admit** that he somehow waived or forfeited or otherwise became **voluntarily deprived** of the protections and right to final adjudication of the within issues of contempt and arrest by this District Court under 28 USC 157(c)(1):

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. <u>In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court,</u> and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

Appellant contends that **nothing within 28 USC § 157(c)(1)** either provides for, or contemplates, or addresses, or directs, or even suggests any possibility of that law's unnoticed, unwritten, inadvertently mis-comprehended, unintentionally-and-wholly misunderstood, waiver or forfeiture of the right to a District Court final decision of the issues of contempt and arrest.

In the instance of the within falsified and contrived contempt motions, all relevant facts and questions should have been decided by this Court. By the time the contempt

motions came before the Bankruptcy court, Appellees (most of whom are close personal friends of Judge McKittrick) had lied, misrepresented perjured and falsified so much that the Bankruptcy court's hostility, bias and prejudice were so intense against Peter Szanto that any order, no matter how absurd (like castration, loss of a hand or foot or blinding) would have been readily granted.

Appellant presents this brief seeking reversal of proceedings in the trial court without consenting or agreeing that the any entry of any decision was a final decision as to the dispute between the parties herein. Or that Appellant consented to the Bankruptcy court making any non-core final decision as to contempt or arrest.

## 2. **Jurisdiction**

28 USC § 158(a) allows this District Court to hear appeals from final judgments and orders of the Bankruptcy Courts:

> "**(a)** The district courts of the United States shall have jurisdiction to hear appeals
> **(1)** from final judgments, orders, and decrees . . . . . .
>
> of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges
>
> under section 157 of this title."

The Bankruptcy court decisions seeking review and reversal are the following:

a)  [APPENDIX 1-6] ORDER (filed 8-30-2018)

b)  [APPENDIX 7-12] ORDER (filed 10-2-2018)

c)  [APPENDIX 13-20] ORDER (filed 1-8-2021)

d)  [APPENDIX 21-27] ORDER (filed 2-25-2021)

e)  [APPENDIX 28] ARREST WARRANT (filed 2-25-2021)

### 3. **Harmful Error Basis for Reversal**

Appellant herein attacks the trial court's decisions which are contended to be, and will be demonstrated to be, clearly erroneous and **intentionally abusive** of ALL judicial power and discretion: 1) when analyzed as to logic and basic human understanding of reality, 2) plain and clear meaning of various laws (especially the laws of the sovereign nation of Singapore, 3) when assessed and considered in regard of the facts and evidence of this case, 4) when considered in contra-position with Judge McKittrick's **diametrically opposite rulings in these same cases in favor of – and benefit for persons upon whom McKittrick's judicial grace is lavished without limitation** and without regard to any of the most essential ethical standards of fairness, truth, justice or law.

Appellant's analysis relies on the well settled law that appellate review regarding questions of law, need be considered de *novo. Allis Chalmers Credit Corp., et al. v. Tri-State Equipment, Inc.* (1986) 792 F.2d 967 accord *Vibra-Tech Engineers v. United States* (1986) 787 F.2d 1416. As will be seen throughout this brief, Judge McKittrick rules, nearly exclusively, on the basis of purposefully **misapprehending** the laws of the United States so that those knowingly erroneous decisions can be used to keep Peter Szanto trapped and subservient to this endless Bankruptcy.

Appellant prays this court, *de novo*, to review anew all of the matters which will be presented as clear errors of the trial court's various decisions referenced herein.

Furthermore, this Court's review of questions of fact and law which involve "primarily a consideration of legal principles" should also be considered *de novo. Mullan v. Quickie Aircraft Corporation* (1986) 797 F.2d 845, 850.

Here, when Appellant references "consideration of legal principles" he means fundamental fairness and essential equity. That is, looking objectively at the underlying Bankruptcy herein: 1) there is no rational basis for this Bankruptcy to be continuing now into its 7th year, 2) there is no valid basis for the depraved indifference murder of Susan Szanto by the Trustees and their counsel, 3) it is unreasonable to believe that the true

function of the Title 11 Bankruptcy laws is to expropriate and confiscate $8.5 million from Peter Szanto along with $2.5 million of separate property, non-Bankruptcy property, non-community property and $700,000 of personal effects from Susan Szanto.

In other words, Appellant contends that when the *Constitution* enabled the law of Bankruptcy neither the purpose nor the goal were to extract all of a debtor's assets so those assets could be handed over to Trustees and their counsel concocting evermore silly, unnecessary and knowingly fraudulent actions to drive forward and continue the unconscionable looting of Bankruptcy estates until the debtor's last nickel was stolen.

The reason Appellant is pursuing this Appeal is not merely to vacate and set aside the improper contempt citations and arrest warrant against him, but so the realization finally comes to Judge Simon that the within Bankruptcy has been improper and abusive from its inception. And that Peter Szanto is merely a hostage in Appellees and their counsel's unending abuse of Bankruptcy law!!

## 4. <u>FACTS</u>

When Appellant previously brought to this Court's attention Judge McKittrick's 1st hearing inquiry about how to pronounce 'Szanto,' it was not whining about ouchies and boo-boos, because of a perceived slighted. Rather, it was clear evidence of judicial behavior the complete opposite of District Judges Casey and Freeman for whom Appellant clerked. Those judicial officers (and others for whom Appellant substituted) were meticulous about being certain that their knowledge and pronunciation of all those appearing before them was exact and always correct. (Phoning some local university's language department takes only moments).

Judge McKittrick proceeding contrarily to what Appellant had directly witnessed from many other judicial officers was merely demonstration of an aspect of judicial behavior antithetical to what Appellant understood to be normal, proper and respectful.

The next demonstration of Judge McKittrick's disdain for Appellant was denial of the electronic filing privilege. [APPENDIX 29-30] Thereby Appellant sustained the first occurrences of unnecessary and irrational bias. No other judge had previously denied Appellant the ability to file electronically. Particularly abusive about that denial was that Judge McKittrick intentionally hijacked that petition intended for the presiding judge's authority and discretion.

The ECF privilege was never meant to be a bludgeon against *pro se* litigants who are already at an extreme disadvantage against trained attorneys, who, as so many in the within series of cases, are close personal friends and former law partners of the Judge McKittrick.

In any event, denial of the ECF privilege extracted several thousand dollars from Appellant who thereby needed to use FEDEX delivery to make certain his papers arrivedon time.

Third, Judge McKittrick has stated specifically and emphatically dozens and dozens of times he does not care for Appellant's demeanor. Judge McKittrick has very often stated his professional analysis that Appellant's demeanor is that of a liar. Indeed, Judge McKittrick has orally emphasized that the decisions in his court are made based wholly on the Bankruptcy court's assessment of Appellant's demeanor.

Appellant has suggested to Judge McKittrick multiple times that demeanor assessment with consequent decisions made based on "purely visual analysis" are nothing except pure appearance discrimination. Appearance discrimination being all of those biases which are based on skin, hair or eye color or the shape of one's face.

Appellant has encouraged Judge McKittrick to incorporate his many demeanor adjudications into his written decisions. Thereby Szanto could respond or perhaps obtain medical analysis for the features of his face, wrinkle-by-wrinkle. Physician review of the judicial assessments of the way Szanto's looks are being perceived. In 7 years, Judge McKittrick has merely announced his decisions as always being based exclusively on Szanto's demeanor, but has never-ever committed any decision based assessments of facial expressions, visual manifestations or appearance into his opinions.

Given these blatant demonstrations of bias against Peter Szanto's appearance it is no surprise that Appellees realized that they could get away with any offensive and repugnant nonsense so long as the abuse plugged into the hostility already seething from Judge McKittrick.

### a. *How Susan Szanto's HSBC Bank Singapore Account Became the Bankruptcy Trustees' Abusive Obsession*

When Bankruptcy Trustee Arnot first contacted Appellant in December 2017, he **had already** seized all of Appellant and Susan Szanto's financial accounts. Appellant and his wife no longer had access to their money. Obtaining food, getting, gas paying for prescriptions, paying utility bills and other necessities of life were immense problems.

As a "bonus" and initial example of the abuse that has continued now for 6 years, Arnot even seized Appellant and his spouse's retirement accounts which are precluded from seizure by law. California Code of Civil Procedure § 704.115.

During the initial month of Appellant's Chapter 7 **incarceration** in 2017, the Trustee destroyed more than $500,000 of value of the Bankruptcy estate by sheer and total incompetence in regard of Appellant's financial accounts. No doubt, the Trustee, a

close personal friend of Judge McKittrick, likely stole thousands more, knowing that no accounting would ever be required or be necessary to cover-up his looting and thievery.

The Trustee's malfeasance and misfeasance in office regarding Appellant's investments was, among other things, looting Appellant's Bankruptcy estate to finance a month's vacation at the Fairmont Monte Carlo's opulent resort and spa.

While the Trustee frolicked in luxury, Appellant's investment strategies were neglected, disregarded and allowed quickly to lose value due, solely and only, to the Trustee's failures to monitor and take action to protect any of Appellant's profitable bank positions, investments and business strategies.

When Trustee returned from vacation and Appellant tried to explain these many,  but unnecessary, loses the Trustees reaction was to liquidate the balance of Appellant's investments "at the market" and thereby sustain a further $500,000 of loses.

After returning from his luxury vacation in Monaco, Trustee Arnot appeared at Susan Szanto's residence (at the commencement of the Chapter 7 expropriations and seizures, Appellant and Susan Szanto were not living together). Trustee Arnot came accompanied with a moving van and assistants who removed approximately $700,000 of Susan Szanto's own, personal, separate property, non-Bankruptcy property, non-community property (furniture, kitchenware, jewelry).

## 1. **Further Seizures**

One important aspect of Appellant's investment strategy was the trading of foreign currencies and profiting from currency fluctuations.

Appellant often – during the last 50 years traded and held positions in the currency of Singapore.

The trading of Singapore's currency was clearly evident in any review of Appellant's finances.

By March 2018, due solely and only to psychic injury and emotional harm inflicted by the Trustee's confiscation of Appellant's spouse's separate property, non-Bankruptcy property, non-community property, Appellant's spouse required intensive medical care and hospitalization; her mental and physical devastation were complete.

This was not merely mental collapse, but rather bodily manifestations of psychological trauma, most particularly related to Susan's internal organs.

The physical harm and injury maliciously inflicted upon Appellant's spouse by the Trustees and their counsel manifested itself in a multitude of hepatic disorders and atrophy of the blood supply to Appellant's wife's liver.

Appellant contacted the Trustee to apprise that, he, Peter Szanto, would be unavailable regarding the within Bankruptcy while he accompanied his wife to Singapore so she could obtain liver regeneration therapy. After exhaustive research, Appellant had ascertained through aid of medical professionals that Singapore's National University's Medical Research Hospital was accomplishing the most advanced research in those areas which were Susan's most severe traumas.

Travel to Singapore was itself an immense ordeal because Appellant's spouse was too ill to travel by plane. The 6-week trip by ship meant that Appellant was unable to access telephone or internet for most of that time.

## 2. Trustees and Their Counsel Become Obsessed
## With Non-Existent Money in Singapore

Trustees' "greed-dar" (personal radar sensing the availability of more of Appellant's money available to be looted) internalized, imagined and **fantasized that because Appellant was seeking medical treatment for his wife in Singapore, that must definitely mean that Appellant had secreted Bankruptcy estate money to Singapore to be able to pay for Susan's medical treatment.**

The 'how could this be' of this absurd accusation --- that is the Trustee presuming money in Singapore, because Appellant sought treatment for his wife in Singapore---was something the Bankruptcy judge never considered (or understood) because the lying and fabrications of the Trustees and their counsel are always enough to conclusively rule against Appellant without evidence in Judge McKittrick's court.

For this reason, there is nothing more to the Trustees' Singapore allegations and 4 years of additional looting of Appellant's Bankruptcy estate seeking money in Singapore other than this absurd, erroneous suspicion about Appellant's non-existent money in Singapore.

From that time until now, more than 4 years later, Trustees and their local counsel and their hired Singapore counsel, have become obsessed with their imagined, fantasized and dreamed-up notion that there is Bankruptcy estate money to be looted and confiscated from HSBC Bank in Singapore.

### 3. Trustee's Efforts at Intimidation By Seeking Contempt ORDER

In an effort to intimidate Appellant, the Trustee exerted unconscionable emotional stress and psychic injury on Appellant under the phony premise that Appellant was hiding money in Singapore. This culminated on 8-30-2018 when the Bankruptcy court, summarily and without evidence, found Appellant in contempt [APPENDIX 1-6] for allegedly failing to turn over money in Singapore which, simply, did not exist.

Again, accusations about Peter Szanto are all that are required in Judge McKittrick's court. A perfect strategy is to say anything negative, abusive or slanderous or offensive about Peter Szanto and Judge McKittrick will believe it without investigation. The more absurd the lie – the more intense will be Judge McKittrick's belief in the truth of that lie. **Rational consideration of facts is not a metric used by Judge McKittrick**.

Accusations always trump facts and evidence for Judge McKittrick.

Throughout the initial span of time, when Susan Szanto began to need medical assistance, March – August 2018, Appellant stated multiple times that he had no money in Singapore.

After the contempt ORDER, Appellant, based on intimidation, terror and fear of arrest, deprivation of essential life preserving chemotherapy, signed the required documents to the HSBC Bank Singapore under the most extreme conditions of judicial coercion.

Appellant was profoundly fearful that because Singapore is a Moslem nation, Moslem Sharia Law might provide him never requested, totally unwanted rights as to the bank account held at HSBC Bank Singapore by Susan Szanto. That is, even though Appellant had no bank account at HSBC Bank Singapore, a bank officer might imply, infer or mandate Sharia rights based on Islamic male family dominance.

However, no documents provided by the Trustee were acted upon by HSBC Bank Singapore, because – as Appellant had emphasized -- Appellant had no accounts at HSBC Bank in Singapore.

However, because Susan Szanto was gravely incapacitated at the time, Appellant monitored and liaised with HSBC Singapore Bank about the situation to make certain that no money belonging to Susan Szanto – essential to her medical care was confiscated by the Trustees.

A. **Trustee's Efforts to Abscond With Assets**

During consultation with HSBC Bank Singapore a grave problem was pointed out to Appellant. [APPENDIX 4] contains Mr. Arnot's instruction that money be forwarded to a Bank account in Wisconsin for the benefit of Mr. Arnot.

As matters of fact and law, Trustee Arnot is not licensed to practice law in Wisconsin. Therefore, there was grave concern at HSBC Bank Singapore about the

fact that Trustee Arnot could not practice law as a Bankruptcy Trustee in a state where he is not licensed to practice law in any form.

This fact is clear and convincing evidence that the money which Trustees have seized from Peter Szanto is being placed in bank accounts in a state where the Bankruptcy court sistused in Oregon has no jurisdiction.

That is, Trustee's Wisconsin bank account is not any proper account for an Oregon Bankruptcy, because Mr. Arnot is not licensed to practice law (IE, act as a Bankruptcy Trustee) in Wisconsin.

### 4. <u>Further Trustee's Efforts at Intimidation</u>

Rational beings would have then reacted to the evidence of a) Appellant's continuing assertions, under oath, that there were no Bankruptcy estate assets in Singapore and  b) the fact that the affidavit signed by Appellant had not resulted in any action by HSBC Bank Singapore.

However, because the within case is an exemplification of gluttonous greed, the Trustees and their counsel --- became maniacally obsessed with generating for themself unnecessary fees for  accomplishing nothing in a situation where nothing could or needed to be accomplished, because there no Bankruptcy estate assets in Singapore.

After August 2018, while Appellant presumed and thought the entire matter of Trustees' false allegations of Bankruptcy estate money in Singapore totally and completely resolved, the Trustees were nonetheless obsessing over ways to loot and expropriate (gravely hospitalized) Susan Szanto's money in Singapore.

The shocking fact is the reality of this case. Susan Szanto, gravely ill being hounded for her separate property, non-Bankruptcy property, non-community property by the greed and avarice of the Trustees and their counsel.

## 5. <u>Trustees Commence Litigation Against Appellant in Singapore</u>

Trustees and their counsel, without notice of any type to Appellant or Susan Szanto engaged Singapore counsel to commence an action to obtain Appellant's non-existent alleged money from HSBC Bank Singapore [APPENDIX 31-32]. That action was commenced January 21-2019. Appellant by way of the laws of Singapore became, and still is, a putative legal Bankrupt under Singapore's law.

However, Trustees and their USA's counsel's and their Singapore counsels' prosecution of that litigation is an obscenity of law and a mockery of the judicial process of Singapore **<u>BECAUSE AFTER 3 YEARS IT STILL HAS NOT BEEN SERVED</u>**!!*1*

The Singapore litigation [APPENDIX 31-32] is a grave affront to the basic principles of Anglo Saxon law as practiced in the United States and Singapore, because a) it was never noticed, b) it was never served, c) proceeded contrary to law because it was presented *ex-parte* without any basis, cause or legal justification to be heard *ex-parte*, d) relied not merely on a non-existent cause of action, but a cause of action specifically precluded by Singapore law.(*infra at Memorandum # 'd.'*)

As will be explained in the Memorandum, the unconscionable looting of Appellant's Bankruptcy estate has become a psychological obsession for the Trustees, Trustees' counsel, and the Singapore law firm which was retained by Trustees.

The Trustees and their counsel know that Judge McKittrick's absolute and clear intent is to liquidate all of Appellant's $8.5million to benefit Trustees' and their counsel. Trustees and their counsel know that as this 7-year-old Bankruptcy progresses to 10, 20, 30 years they will be rewarded with all of Appellant's Bankruptcy Estate.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1. *<u>Another aspect of the looting in this case is that after 3 years of the never noticed never served action in Singapore, Trustees and their counsel and the Singapore law firm have both been enriched by approximately $½ million dollars each for the act of maintaining litigation not allowed by Singapore law.</u>*

**6. Trustees Become Sad that they Are Unable to Abuse Singapore's Law in the Manner Judge McKittrick Allows them to Abuse USA Law – So They Pull "An Oldie But Goodie" Out of Their Bag of Trickery and Replead Contempt Knowing Full Well That Judge McKittrick Will GRANT Any Motion to Harm Peter Szanto Regardless of Facts, Truth, Law, Propriety, Morality or Any Other Aspect of Reality!!**

What this appeal is about is the Trustees and their counsels total abuse of law!

What occurred is this: a) in 2018 Appellees alleged Appellant would not sign a document to release funds from HSBC Bank in Singapore.

b) Appellant set aside his concerns and signed anyway

c) Thereafter in January 2019, Appellees commenced an ex-parte Bankruptcy action against Appellant in Singapore *ex-parte* and without notice or service.

d) Appellees' ex-parte, unnoticed, never served action in Singapore is unsuccessful, because Appellees cannot find a Singapore judicial officer to disregard their lack of service and lack of notice abuse of Singapore's law.

e) August 2020, Appellees refile their contempt motion [APPENDIX 33-41] seeking the same relief which was granted 2 years earlier.

**A. Reality Must Be Allowed to Participate in this Bankruptcy**

The incredible absurdity of Appellees' second contempt motion is patent on

its face as the fact of **why**, if Appellant had not actually signed the 2018 document ordered by the contempt ORDER, why would the Appellees wait 2 years to seek enforcement of Appellant's alleged disobedience??

Second, likewise to emphasize the incongruity of the second contempt motion: why would Appellees and their Singapore counsel pursue a new Bankruptcy action in Singapore – *ex parte*, without service and without notice – [APPENDIX 31-32] if Appellant remained in contempt in the United States ??

### B. Very Distinct Response to the Query of Appellees' Two Year Hiatus of Reliance on Contempt is that Appellees Sought to Pile on Obscene and Unconscionable Fees So As to Facilitate Their Abuse of their Trustee's Office by Obtaining Excessive Fees for Unnecessary Work and Non-Existent Controversies

There was no reason for a two-year delay in the second contempt motion if Peter Szanto had actually failed to comply with the first!! All that was occurring was that Appellees were "racking in the loot" of improper fees by pursuing an action in Singapore in total contravention of that nation's Bankruptcy laws.

Of course, this logic and reality does not impress Judge McKittrick. Judge McKittrick will grant Appellees any relief that will cause harm, pain and misery to Peter Szanto – and generate additional Trustee and their counsels' fees.

Thereupon, the entire of the second contempt motion was nothing but a shocking scam to terrorize Appellant emotionally and psychologically with the possibility of being thrown in jail and thereby being deprived of life preserving chemotherapy.

Thus, in the final analysis what puts the **lie** to the second contempt motion [APPENDIX 13-20] is the fact that had Peter Szanto not followed the command of the first contempt ORDER [APPENDIX 7-12] why would Appellees wait two years to enforce that contempt order?

## 7. **The Bankruptcy Court, "Hand-in-Hand," With the Trustees Facilitates the Confiscation of Appellant's Money and Property By Failing to Allow Appellant the Fundamental Right to Defend Himself**

While this Court may not like Appellant's comments about the Bankruptcy judge's abuse of law, denial of judicial process and bias in regard of Appellant, these are nevertheless the true and painful facts of the series of cases now before this Court.

The Bankruptcy judge's discovery denial abuses are at [APPENDIX 13].

First, the context in which these events were occurring in November and December 2020 were during the most excruciating medical crises, hospitalizations and final agonies leading to the death of Susan Szanto on 12-23-20.

For Judge McKittrick the theory of psychological punishment to inflict on Peter Szanto seems to be that if he rejects a stay based on medical emergencies one time then subsequent rejections based on new medical urgencies (as to a person who is terminally ill with melanoma, needs thrice weekly chemotherapy and is battling the final decline and death of his most beloved spouse) are merely "solid," justified, mandated enforcements of an order which really need not take into consideration the reality of suffering and emotional anguish which Appellant is struggling through. Indeed, this dissociation from reality that one denial of sympathy for Appellant's medical crisis opens all justifications for further denials based not on medical necessities, but because previous denials need be enforced. Factually, it appears that Judge McKittrick seems to believe that an initial denial of Appellant's medical needs has no relationship to the second, third or fourth time further medical crises arise.

Thus, this Court can recognize that the trial court's denial of discovery

[APPENDIX 13]

On January 8, 2021, Debtor filed a motion captioned 2nd Motion for Stay of Contempt Proceedings for the Purpose of Conducting Mandatory Discovery,

merely denied Appellant the ability to demonstrate the absolute absurdity and abuse of process being fully and completely presented in evidence at the contempt hearing.

Had Discovery been allowed, Appellant would have propounded written interrogatories focused on the fundamental questions of procedural abuse by the Appellees (requiring those responses to be signed under penalty of perjury):

     i)     if Peter Szanto did not comply with the demands of a contempt order in 2018, why was further action as to that contempt order delayed for 2 years?

     ii)    if Peter Szanto did not comply with the demands of a contempt order in 2018, why did the Trustees pursue an involuntary Bankruptcy action in Singapore against Peter Szanto in 2019?

     iii)    if Peter Szanto did not comply with the demands of a contempt order in 2018, why did Trustees pursue an action against Peter Szanto in Singapore that was prohibited by Singapore's laws?

Upon these facts, because Judge McKittrick facilitated disregard of the most fundamental inquiries that need be made of the Trustees and their counsels' abject, intentional, calculated looting and thievery based on their own continuing fabrication of non-existent controversies.

The reality of the basis for the second contempt order was resigned to nothing more than the Trustees lying about the events as to the first contempt order so that they could continue further to unconscionably enrich themselves.

These constraints on the trial court's ability to find any rational justification for the second contempt motion scream-out for reversal on the basis that it is impossible to believe that these **aggressive** Trustees and their counsel would wait two years to enforce the First contempt order, while during the same period pursuing a cause of action precluded and prohibited by the laws of Singapore!

# 5. MEMORANDUM

### a. *Introduction*

Since a clear understanding of the facts of this Appeal requires knowledge of Singapore's law, a primer is provided. This guide is provided so the Court can easily refer to the Singapore Court's official website to confirm any of the laws and rules to which Appellant refers in this Brief.[APPENDIX 42-43]

### b. *Finding Singapore's Law*

Access to Singapore's laws is wholly transparent. Throughout this brief when Appellant references Singapore's laws, confirmation and viewing of those laws is readily available at Singapore's Government's official legal and judicial portal referred to as "Singapore's Statutes Online." [APPENDIX 42-43] displays and shows the format of that page as a search engine. [APPENDIX 43] contains a primer, sitemap and tools to obtain familiarity with finding and accessing Singapore's laws.

### c. *Those Opposing Appellant are Privileged to do Whatever they Please Irrespective of Truth, Justice, Law or Reality*

When Trustees' Singapore counsel filed [APPENDIX 31-32], they (meaning the Trustees, Trustees' USA counsel and Trustees' Singapore counsel) anticipated quick

Singapore Supreme Court judicial consent to their obscene looting and thievery.[2]

Indeed, as an abomination upon 1000 years of Anglo-Saxon law, jurisprudence and fundamental fairness, the [APPENDIX 31-32] "Ex Parte Originating Summons" does not even attempt to give notice nor warning nor service of the pleading nor explain why notice and / or service and / or some warning might be unnecessary.

Without any education in the laws of any specific nation – and based only on the words themselves, even a person with absolutely no legal training knows that a "summons'" purpose is to summon—hail---bring--command a person to a legal proceeding for fair adjudication before an impartial magistrate or other judicial officer.

---

2. Since Appellees knew that Appellant had no bank account in Singapore, the Trustees and their counsels' true goal was always the looting of Appellant's spouse's money and property in Singapore. That is, Appellant's spouse was an IDF (Israeli Defense Force) liaison officer to Singapore's military from 1973-1995 and had an HSBC Singapore Bank account throughout that period. Appellant believes to a certainty that HSBC counsel Hogue provided this information to the Trustees (along with revealing the private and confidential exact amount of Appellant's spouse balance in that account. After Judge McKittrick's failure to stop the Trustees from looting and confiscation of Appellant's spouse's non-Bankruptcy property, non-community property and separate property, Trustees knew (because of their close personal friendship with Judge McKittrick) that they could do whatever they pleased. That is why the Singapore action was undertaken. Thereafter, the intense emotional distress inflicted upon Appellant's spouse by the theft of her property (furniture and household possessions and jewelry) caused (without intervening factors) Appellant's spouse's death. Appellant contends the Trustees and their counsel are the depraved indifference, with malice aforethought, murders of his wife.

However, that is not what Appellees intended. Appellees and their Singapore counsels' intent was looting, and thievery. The providing of notice would merely have complicated Appellees' scandalous and despicable goal of larceny.

Singapore's Supreme Court Courthouse is just a few blocks from Singapore's National University Medical Research Facility whereat Appellant's spouse was suffering the wrath of looting of her property by the Trustees and their counsel and the shocking indifference of the Bankruptcy judge as she battled courageously in the ICU trying not to die. Every morning and every afternoon, Appellant passed by the Singapore Supreme Court on the way to or after visiting his desperately ill and incapacitated wife.

Because Appellant anticipated trickery and deceit from Appellees, he checked the Singapore Supreme Court's posted dockets every morning and every afternoon.

When Appellant's name appeared on the docket, he appeared in the hearing room where the sham / false / phony / fraudulent "*ex parte* hearing" was scheduled, February 4, 2019 on the 2 P.M. calendar of Registrar Bing. (Registrar = Magistrate)

Appellees' team of six Singapore 'drop-dead-gorgeous' female counsel (all dressed in alluring mini-suits with plunging necklines) appearing (*on the clock pulling down obscene and unconscionable fees for an allegedly ex-parte hearing which one single competent attorney could easily have lied her way through*) were stunned by Peter Szanto's presence -- because Singapore counsel had done everything possible **fully to deprive Appellant of notice, service, warning and all other opportunity to be heard.**

Registrar Bing readily agreed with Appellant that there are no provisions under Singapore law for a never noticed, never served *ex-parte* hearing which could proceed without provision for, or explanation of why notice, warning, service and an opportunity to be heard in defense should not be had.

Registrar Bing on that day, February 4, 2019, ordered Appellees to notice and serve Appellant not merely with the Summons, but also with all supporting documents explaining their positions.

From that day until now, exactly 3 years later, Appellant has never been served nor noticed with even a single document from the Singapore proceeding!!

Even though a judicial officer of the Supreme Court of Singapore has so ordered Appellees to effect service.

Shockingly, it is incongruous to comprehend how the Trustees and their counsel are able to advocate any proceeding which they initiated where no effort at service or notice has ever been made or even attempted!!

The fundamental rule enunciated by the United States Supreme Court many times is: "for the exercise of judicial jurisdiction *in personam*, there must be due process, which requires appropriate notice of the judicial action and an opportunity to be heard." *Blackmer v. United States*, (1932) 284 U.S. 421, 438. Hundreds of identical decisions by the courts of both Singapore and the United States are the foundation of adjudication where both sides are heard by an impartial judicial officer.

The Singapore Supreme Court's Rules of Court, Order #10, Rule 1 likewise mandates service of all originating, commencing process as:

> **Subject to the provisions of any written law and these Rules, a writ must be served personally on each defendant.**

The Singapore Supreme Court's Rules of Court, Order #1, Rule 4 explains:

**"originating process" means a writ of summons or an originating summons**

Thus, the originating process in this case [APPENDIX 31-32] filed in the Singapore Supreme Court has simply never been noticed nor served on Appellant at any time since its filing on January 21, 2019.

### d. *Ex-parte Cause of Action in Singapore's Supreme Court [APPENDIX 31-32] is Barred by the Laws of Singapore*

Because the purpose of the Originating Summons [APPENDIX 31-32] filed in the Singapore Supreme Court was, and is, intentionally to mislead the Supreme Court of Singapore (and this honorable United States District Court in reviewing), it does not reveal which law the originating summons [APPENDIX 31-32] is predicated upon for legal justification, source of law or support as a valid and / or proper cause of action.

The cited justification from the Singapore Supreme Court's Rule of Court Order 92 Rule 4 – is a catchall rule which merely states:

**For the avoidance of doubt it is hereby declared that nothing in these Rules shall be deemed to limit or affect the inherent powers of the Court to make any order as may be necessary to prevent injustice or to prevent an abuse of the process of the Court.**

Of course, because the Originating Summons [APPENDIX 31-32] is a pleading interposed upon the assumption that Appellant will never appear because Appellant will never be served, there is scant reason to have any justifying cause of action at all!

There is no recitation or indication of any valid basis or cause of action which is complained of or at issue in [APPENDIX 31-32].[3]

However, there is one, and only one, Singapore law which ostensibly could justify the *in personam* recognition of a court determination from the United States. That single possible law is Singapore's *Reciprocal Enforcement of Foreign Judgments Act*.

However, the *Reciprocal Enforcement of Foreign Judgments Act* specifically exempts any Bankruptcy matters. As explained at paragraph 2. –(2) of the *Reciprocal Enforcement of Foreign Judgments Act*:

> (2) For the purposes of this Act, "action in personam" shall not be deemed to include any matrimonial cause or any proceedings in connection with any of the following matters:
>
> a) matrimonial matters
> b) administration of estates of deceased persons
> c) bankruptcy

Thus, upon the basis of Singapore's own law, the action commenced by Appellees in Singapore is barred, as a matter of Singapore's law from even being prosecuted before the Singapore Supreme Court because it is pursued upon the basis of recognition of a foreign judgment in a Bankruptcy case under law which does not allow for any such recognition or enforcement for any foreign Bankruptcy!!!

---

**3.** **The reason the matter in Singapore became, and remains, a significant issue is that Appellant's spouse – a career officer in, and 30 year veteran of, the Israeli Defense Force – was being provided medical benefits from Israel to her separate property, non-community property, non-Bankruptcy property HSBC Singapore Bank account. _Moreover,_ the entire of the abuse of process that was, and is, the Singapore proceeding was focused solely on stealing Appellant's dying spouse's money so that Appellant's spouse _could not_ obtain medical treatment and would die!!! As later occurred Appellant's spouse did die, and it is for the unconscionable thievery – well exemplified as to its grotesque horror in the Singapore proceeding that Appellant contends that the Trustees, their counsels are guilty and culpable for Appellant's spouse's depraved indifference murder. Of course, the mockery of justice in both Singapore and the United States committed by the Trustees and their counsel is that the sole motivation was pure greed with absolutely no legitimate or even ostensible Bankruptcy purpose.**

**_That is the shameful nature of this Bankruptcy: Trustees are willing to steal from a dying (now deceased) woman so as to fatten themselves further with unconscionable self-enrichment_.**

In sum, the issue here is that even though Appellant complied fully with the Trustees and the Bankruptcy court's demands for signing documents under pain of contempt – which Appellant did not once, but twice, the Trustees nevertheless moved forward with involuntary Bankruptcy litigation in Singapore.

The Singapore litigation was an abuse of the laws and process of the nation of Singapore because said action was precluded by the laws of Singapore *ab initio* and undertaken solely for the conspiratorial purposes of ransacking Appellant's spouse's HSBC Bank Singapore account outside all bounds of law.

The result of all of these machinations by the Trustees was nothing but unconscionable self-enrichment for purposes not supported by any law in either the United States or Singapore.

Ultimately, the Trustees became obsessed and mesmerized by the idea that their personal self-enrichment was more important than Susan Szanto's survival.

Susan Szanto was a person of value, a heroine of Israel's fortitude that there will never be another holocaust, whose presence on Earth was significant.

For Trustees, however, the decision was that Susan's life was unimportant to their complete and total confiscation of her money and property. The sham contempt applications, the demands to incarcerate Peter Szanto, the improper and contra-legal proceeding in Singapore were all undertaken with knowledge that Judge McKittrick would reward Trustees with costs and attorneys' fees no matter what nonsense and lying were pled by them in the Bankruptcy court.

### e. *<u>The Tragedy in the Trial Court</u>*

The judicial tragedy of Judge McKittrick is his belief that his friends and colleagues from his many years in practice as an attorney guarantee that those of his acquaintance will always tell the truth.

Compound this with Judge McKittrick's reliance on appearance as a factor in truthfulness and, as a practical manner, it is easy to understand how whatever Peter Szanto says in Judge McKittrick's court will always be perceived a lie, irrespective of all of Peter Szanto's veracity.

From these factors, this Court need make the determination that there was never any valid basis for a contempt citation either in 2018 or 2021.

## 6. Declaration / Verification

a. **I, Peter Szanto, the Appellant herein declare as true, under pain of penalty of perjury that all of the statements in this application are true based on my own personal knowledge.**

b. **Or are declared to be true based upon information and belief which I reasonably understand to be true.**

c. **I verify, under penalty of perjury that the foregoing is true and correct.**

<u>18 January - 2022</u>  /s/ *signed electronically*  Peter Szanto at Irvine CA

# 7. Conclusion

For this Court it is possible the sum conclusion after reading this Brief might be: WOW, the Trustees plan is way too complicated to be intentionally thought out and executed.

**But no**, the better question to ask is to what extremes will Trustees and their counsel -- who usually handle zero value / no asset Bankruptcies – go to expropriate $8.5 million of Appellant's Bankruptcy estate, heaped onto stealing $2.5million of Susan Szanto's separate property, non-Bankruptcy property, non-community property added also to $700,000 of Susan Szanto's separate property furniture, jewelry and household possessions.

**The opportunity to increase their personal wealth by $11.7 million dollars is what motivates the Trustees and their counsel to their very despicable acts.**

Based on the 6 years of "open field blocking" by the Bankruptcy court, Susan and Peter Szanto's lifetime of work is merely swallowed and evaporated by the further reliance of Trustees and their counsels' belief in the "eternal truth" that judges easily dismiss non-attorneys as know-nothing numbskulls who don't deserve to have money or property in any event.

The contempt and arrest citations need be vacated because there has never been any basis for their legal validity.

The harmful error in the trial court was reliance on the notion that friends and colleagues can always be trusted, but a person whose name is tough to pronounce and whose appearance is unappetizing must be lying.

Reversal is legally justified and need be granted.

Most Respectfully,

Dated   January 18, 2022   /s/ *signed electronically* Peter Szanto

**WORD COUNT**

*The within brief is 7,189 words in length as counted by the Microsoft Word 2022 program which was used to compose it.*

/// service is on next page

# <u>PROOF OF SERVICE</u>

My name is Maquisha Reynolds, I am over 21 years of age and not a party to the within action. My business address is PO Box 14894, Irvine CA 92623.

On the date indicated below, I personally served the within: <u>BRIEF</u> on the following by placing the within document in postage pre-paid envelope addressed as:

1) JPMorgan Chase Bank's Portland Counsel
   Tim Cunningham at Davis Wright Tremaine
   1300 SW Fifth Avenue, Suite 2400,
   Portland, OR 97201

2) United States Trustees  Arnot + Smith
   620 SW Main St  #213
   Portland, OR 97205

3) Boris Kukso
   United States Department of Justice
   Tax Division
   P.O. Box 683
   Washington, DC 20044

4) United States Bankruptcy Court
   1050 SW Sixth Avenue # 700,
   Portland OR 97204

5) Gary L. Blacklidge
   Jordan Ramis PC
   2 Centerpointe Drive, 6th Floor
   Lake Oswego, OR 97035

6) Nicholas J. Henderson
   c/o Motschenbacher & Blattner
   117 SW Taylor St., Suite 300
   Portland, OR 97204

Service by e-mail was to Bank of America's Portland counsel, Mr. Laurick, at:
jlaurick@kilmerlaw.com and tparcell@kilmerlaw.com

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Signed at Irvine CA.

Dated January 18, 2022 _/s/ signed electronically_  Maquisha Reynolds